Gaddy Motor Company, Inc. v. Commissioner. William F. Gaddy and Vera May Gaddy, Husband and Wife v. Commissioner.
Gaddy Motor Co. v. Commissioner
Docket Nos. 58789, 58790.
United States Tax Court
T.C. Memo 1958-189; 1958 Tax Ct. Memo LEXIS 35; 17 T.C.M. (CCH) 944; T.C.M. (RIA) 58189; October 31, 1958
*35 1. Commissions on automobile insurance were received by an individual who was an employee of the corporate petitioner, a closely held incorporated automobile agency, and were paid over by the employee to the president of the automobile agency, who included them in his personal income. Held, that in conducting the insurance agency business the individual was not acting on behalf of the corporate petitioner and that the respondent erred in including the commissions in its gross income. 2. Held, that petitioner has not shown error in the respondent's determination that amounts expended by the corporate petitioner in payment for show horses purchased by its principal stockholder, the individual petitioner, constituted dividends. Claude C. Pierce, Esq., 214 Southeastern Building, Greensboro, N.C., for the petitioners. Harvey S. Jackson, Esq., for the respondent. ATKINS
Memorandum Findings of Fact and Opinion ATKINS, Judge: The respondent determined deficiencies in the income tax of the corporate petitioner for the years 1948 to 1951, inclusive, in the amounts of $1,974.92, $3,937.74, $4,252.29, and $4,073.50, respectively; and of the individual petitioners for *36 the years 1948 and 1949 in the amounts of $2,427.66 and $3,228.18, respectively. The principal issues presented for decision are whether insurance commissions received by the corporate petitioner's officeremployee, Hardister, in the years 1948 to 1951, inclusive, constituted income of the corporate petitioner and whether corporate funds used for the purchase of show horses registered in the name of the principal stockholder, the individual petitioner, Gaddy, constituted dividend income to such petitioner. Findings of Fact Some of the facts are stipulated and are incorporated herein by this reference. The corporate petitioner, Gaddy Motor Company, Inc., was organized and exists under the laws of North Carolina, with its principal place of business in North Wilkesboro, North Carolina. It filed its income and excess profits tax returns for the calendar years 1948, 1949, 1950, and 1951 with the district director (then collector) of internal revenue for the district of North Carolina. Such returns were prepared on an accrual method of accounting. The individual petitioners, William F. Gaddy and Vera May Gaddy, are husband and wife residing at North Wilkesboro, North Carolina. *37 Their joint income tax returns for the taxable years 1948 and 1949 were prepared on the cash receipts and disbursements basis, and were filed with the director (then collector) of internal revenue for the district of North Carolina. For convenience the corporate petitioner will be referred to herein as the corporation, and William F. Gaddy will be referred to as Gaddy. Vera May Gaddy is a party here only because of having joined with her husband in filing joint income tax returns. During the years involved, the corporation was engaged in business as an automobile dealer and operated under a franchise from General Motors Corporation for selling and servicing Chevrolet and Buick automobiles. Its certificate of incorporation has broad purpose provisions, which include dealing in motor vehicles, road machinery, electric motors, operating a garage, and dealing in real estate. It also provides, in part, as follows: "(g) Said corporation shall have the power and authority, if and when in the judgment of its directors it shall be deemed advisable and for the best interest of the company, to operate an Insurance Company, or agency, and conduct the business of a general finance company, *38 and to do any and all other things necessary to be done for the successful operation of the various enterprises herein mentioned." At no time since its incorporation has the corporation been licensed by the State of North Carolina Insurance Department to act as an agent for any insurance company, and no action was ever taken by its board of directors to authorize it to operate an insurance company or agency. [1]
During the years 1948 to 1951, inclusive, Gaddy was president of the corporation. He owned all of its outstanding capital stock with the exception of qualifying shares standing in the names of his wife and William A. Hardister. William A. Hardister was first employed by the corporation on September 1, 1945. During the taxable years involved, Hardister was its secretary, office manager, and bookkeeper. For the performance of services in those capacities he received a salary from the corporation. Within a few days after he was employed by the corporation, *39 Hardister was requested by Gaddy to obtain a state license to sell hazard insurance in the State of North Carolina, in order to act as agent for Motors Insurance Corporation. Hardister did obtain such a state license in his individual capacity. Such licenses are valid for only one year. An application must be filed each year. Hardister held such an annual license for each of the years 1948 to 1951, inclusive. In September 1945, Motors Insurance Corporation, a subsidiary of General Motors Acceptance Corporation, entered into an agreement with Hardister whereby he was to sell hazard or casualty insurance as its agent. Neither the corporation nor Gaddy was a party to that agreement, and neither was referred to therein. The annual state license application was sent by Motors Insurance Corporation to Hardister each year, and was returned by him to such corporation, which forwarded it to the state, and paid the license fee. The state license was issued directly to Hardister. Hardister also was an agent for Pyramid Life Insurance Company and Sturdevant Life Insurance Company in the sale of credit life insurance contracts on financial deals. During the taxable years involved, Hardister *40 sold hazard or casualty insurance, including both new and renewal coverage relating to automobiles, as agent of Motors Insurance Corporation irrespective of whether or not the automobile for which insurance was obtained was purchased from the corporation. Sales of insurance to customers other than to purchasers of automobiles from the corporation were actively solicited by Hardister during this period. Automobiles purchased from the corporation were not required to be insured through Hardister and some customers purchased their insurance elsewhere. Customers of the corporation were not required to purchase insurance from Motors Insurance Corporation when a car was financed through the General Motors Acceptance Corporation, and some customers placed their insurance elsewhere. The bulk of the insurance business was handled by Hardister on the premises of the corporation. Forms and supplies were furnished by Motors Insurance Corporation, which also paid the annual state license fee. The other expenses in connection with the insurance agency business handled by Hardister, amounting to approximately $300 to $500 per year, were paid by the corporation. Hardister bore no part of the expense. *41 Checks for commissions on sales of insurance were drawn by Motors Insurance Corporation in the name of Hardister. At the time Hardister talked to Gaddy about obtaining a state insurance license, Gaddy did not advise Hardister concerning the disposition of the checks for commissions. There was no written agreement between Hardister and Gaddy, but it was Hardister's understanding that he was merely acting as Gaddy's agent in receiving the commissions. Upon the receipt of the first such commission check, it was endorsed by Hardister and Gaddy put it in the funds of the corporation. Thereafter until January 1948, the insurance commission checks were endorsed over to the corporation. In January 1948, Hardister and Gaddy discussed the insurance business with an accounting firm and were advised that the commissions were income of Gaddy rather than income of either Hardister or the corporation. Thereafter the commission checks were endorsed by Hardister and were deposited to Gaddy's personal account. The amounts of the insurance commission checks received by Hardister in the years in question from Motors Insurance Corporation which were endorsed over to the petitioner were as follows: Year
Commissions
1948
$4,611.43
1949
7,950.03
1950
9,429.85
1951
9,171.67
*42 Gaddy did not reimburse the corporation for any expense which it incurred in connection with the insurance agency business handled by Hardister. Hardister rendered services to Gaddy in connection with a farm and horse show business operated by the petitioner, but received no compensation from him for these services or for any services in connection with the insurance agency business. During the years 1948 to 1951, inclusive, the corporation collected insurance premiums on behalf of Motors Insurance Corporation from the purchasers of automobiles from the corporation as well as premiums on insurance renewals, and remitted such collections to Motors Insurance Corporation. In its returns for the years in question the corporation reported these insurance premiums as income and deducted the insurance premiums remitted to Motors Insurance Corporation. The respondent in his notice of deficiency excluded such insurance premiums from income and disallowed the deduction of the premiums remitted to Motors Insurance Corporation. Gaddy reported the above-shown amounts of insurance commissions in his joint income tax returns for the years 1948 to 1951, inclusive, and paid the tax due thereon. *43 The corporation did not include any of such commissions as income in its returns for the years 1948 to 1951, inclusive. The respondent in his notice of deficiency added such amounts to the income reported by the corporation. Hardister was not acting as agent of the corporation in the conduct of the insurance agency business. The insurance commissions were not the income of the corporation. In May 1948, Gaddy purchased a registered show horse named "Gold Coin" for $3,800, and in August 1948, he purchased another named "Roadmaster" for $1,500. In December 1949, he purchased still another named "Midnight Jane T" for $10,000. Each of these horses was registered in Gaddy's name. The corporation paid out of its own funds the purchase price of these three show horses. Contrary to Gaddy's instructions, the purchase price of these horses in each case was charged by the bookkeeper Hardister to an account designated as "Other Assets" on the books of the corporation instead of to Gaddy's personal account, designated as "Accounts Receivable Officers." Gaddy did not execute any notes or other evidences of indebtedness in connection with these payments, nor was interest ever paid by him on *44 the amounts in question. These payments were not shown on the corporate books as dividends. Prior to the time of the hearing in this case Gaddy had sold two of the horses, "Midnight Jane T" and "Gold Coin." At the time of the hearing Gaddy still owned the horse "Roadmaster." At some time prior to March 15, 1952, an internal revenue agent made an examination of the corporation or Gaddy or both and discovered that the horses belonged to Gaddy and that there had been no reimbursement to the corporation by Gaddy. On March 20, 1952, there was for the first time entered in the personal account of Gaddy on the books of the corporation a charge with respect to the outlay by the corporation on account of the horses. On that date the account was charged in the amount of $11,500. Such account also contains a credit, under date of March 15, 1952, representing a payment in cash made by Gaddy to the corporation. At the end of each month during the taxable years Hardister prepared trial balances from the corporation's records. At the end of each year an accounting firm audited the books of the corporation, made adjusting entries, and prepared the tax returns. These trial balances were currently *45 shown to Gaddy and he signed the corporation's income and excess profits tax returns. On December 31, 1948, the corporation paid a cash dividend in the amount of $7,980 on its outstanding capital stock to Gaddy. Such an amount was credited on that date to the personal account of Gaddy. In its income and excess profits tax return for the year 1949 the corporation claimed, under the heading of miscellaneous deductions, a loss of $1,300 on the sale of a horse. In determining the deficiency against the corporation for the year 1949, the respondent disallowed this claimed deduction, holding that the loss was not sustained by the corporation, but by Gaddy, since Gaddy owned the horse. In determining the deficiency against William F. and Vera May Gaddy for the year 1948, the respondent added to reported net income the amount of $5,300 expended by the corporation for horses, on the ground that the expenditures were for the benefit of Gaddy and represented a distribution of earnings and profits of the corporation. For the same reason, the respondent in determining the deficiency against them for the year 1949 added to reported net income the amount of $10,000 expended by the corporation *46 for a horse. The respondent decreased Gaddy's reported income for the year 1949 by the allowance of a deduction of $1,300, representing loss on the sale by Gaddy of the horse "Gold Coin." Opinion The respondent added to income reported by the corporation for each of the years 1948 to 1951, inclusive, the amount of insurance commissions which had been received by Hardister and deposited by him in the personal account of Gaddy. The respondent's position is that Hardister was conducting the insurance agency business on behalf of the corporation in his capacity as an officer and employee, and that when such commissions were received by Gaddy they constituted dividends to him from the corporation. The corporation and Gaddy, on the other hand, contend that Hardister was acting on behalf of Gaddy, who was the principal stockholder of the corporation, in conducting this insurance business. We recently had occasion to consider a similar situation in , and there concluded that an automobile insurance business was not conducted by a corporation engaged in selling automobiles, but rather was conducted by the principal stockholder in his individual *47 capacity. We there recognized that tax laws do not undertake to deny taxpayers the right of free choice in the selection of the form in which they carry on business. In the course of our opinion we stated: "This Court and others have recognized in numerous cases, that segments of what might have been an integrated business may be handled by separate taxpayers; and that the income of such separate taxpayers should not be combined for income tax purposes. See (involving separation of a corporate business, so that the foundry was retained by the corporation, but the manufacturing and sales were handled by a partnership composed of the stockholders); , affd. (C.A. 4) (involving separation of a corporate fruit and produce business, so that the corporation retained the sale of fruits, and the president of the corporation handled the sale of vegetables as a sole proprietor); , affd. (C.A. 3) (involving separation of a corporate business, so that the original corporation retained the manufacturing *48 functions and newly organized corporations took over the handling of sales); (involving separation of the business of a corporation, so that the original company handled the manufacturing, and a partnership of the stockholders handled the sales and servicing of customers); and . This latter case involved facts almost identical with those in the instant case; for there, as here, an automobile dealership was operated by a corporation, and the corporation's president individually acted as an insurance agent for M.I.C. and sold policies to the corporation's customers. The court there held that the insurance commissions received by such agent were not includible in the income of the corporation." The respondent argues that certain facts in the instant case distinguish it from the Epstein case, principally the fact that the insurance business was not conducted by the principal stockholder personally, but was conducted by Hardister, an employee of the corporation, who received a salary from the corporation, but received no compensation from Gaddy. There is, indeed, *49 this difference between the two cases, but we are satisfied from the evidence that Hardister was not acting on behalf of the corporation in obtaining the state license to act as an insurance agent, and in entering into the agency contract with Motors Insurance Corporation. Hardister testified that he was acting on behalf of Gaddy and stated in effect that the reason Gaddy did not apply for a license himself was because he did not possess the educational qualifications necessary to pass the required examination. We note that the insurance policies written by Hardister were not confined to automobiles sold by the corporation. Furthermore, although the corporation's charter was broad enough to include the insurance business, no action was taken by its directors to cause it to enter upon such a business. It did not treat the commissions as its income, whereas Gaddy did. It is not determinative that Gaddy did not pay Hardister any compensation for operating the insurance business. The evidence shows that Hardister was accustomed to rendering various services, without compensation, to Gaddy in the various enterprises which he conducted in his individual capacity. The evidence shows that *50 expenses of the insurance business, in a relatively small amount, were paid by the corporation. However, we consider that these payments were made by the corporation on behalf of Gaddy, and it may be that some portion of Hardister's salary paid by the corporation constituted a payment on behalf of Gaddy for Hardister's services in conducting the insurance business. However, no issue is presented as to whether the expenses or any part of the salary constituted dividend income to Gaddy. It should be added that Hardister testified that although premiums paid for insurance were received by the corporation and transmitted to Motors Insurance Corporation, this was done merely as a matter of convenience to him, since he had to have a method of handling the checks. Hardister further testified that in selling insurance he never represented that he was selling it on behalf of the corporation. This issue is essentially one of fact as to whether Hardister was acting on behalf of the corporation. Based upon the whole record, and in particular the testimony of Hardister that he was acting on behalf of Gaddy, we have concluded and found as a fact that he was not acting on behalf of the corporation *51 in carrying on the insurance agency business. Accordingly, it is our conclusion that the respondent erred in including the commissions in the income of the corporation. It becomes unnecessary to consider certain alternative issues. It may be added that Gaddy does not contend that the commission income is not taxable to him. Insofar as Gaddy is concerned as an individual petitioner, the issue presented is whether an amount of $5,300 expended by the corporation in 1948 and an amount of $10,000 expended by it in 1949, in payment for show horses purchased by Gaddy, constituted dividends to Gaddy. It is the position of Gaddy that these amounts represented loans to him and were not dividends. The decision upon this issue turns upon the intention of the parties, and in ascertaining such intention the acts of the parties and all the attendant facts and circumstances are to be taken into consideration. See , and ; . certiorari denied , affirming . The determination of the respondent that these amounts *52 constituted dividends is presumed to be correct and the burden of proof is upon Gaddy to show that the respondent was in error. The amounts in question were not entered as Gaddy's liabilities in his personal account on the books of the corporation, nor did Gaddy execute any notes or other evidences of indebtedness in connection therewith. Rather, they were included in an account on the books of the corporation entitled "Other Assets." Insofar as the record shows the books did not clearly disclose that these amounts had been paid to or on behalf of Gaddy. It has been stipulated that the amounts were entered by the bookkeeper, Hardister, in the "Other Assets" account, rather than in Gaddy's personal account, contrary to Gaddy's instructions. Hardister testified that Gaddy "indicated" that he intended to reimburse the corporation and that he was told to charge them to Gaddy in his personal account. However, Hardister stated that the reason he entered them as "other assets" was in order to make the books look better, although he conceded that the corporation's books already showed adequate working capital and that there was no necessity for *53 showing additional assets. Although the horses were purchased in 1948 and 1949, it was not until March 20, 1952, after the revenue agent had examined the books and discovered the situation, that any action was taken to cause the corporation's books to show any liability of Gaddy to the corporation, or to make any payment to the corporation. At that time an amount of $11,500 was charged to Gaddy's personal account. It is to be noted that the total cost of the horses was $15,300. Such personal account shows a credit of $10,000 on March 15, 1952, representing a payment in cash by the petitioner. Hardister testified that in addition to the $10,000 paid by Gaddy in 1952, Gaddy also paid some other consideration in an undisclosed amount and at an undisclosed time, in stock dividends, he believed. When asked why Gaddy did not reimburse the corporation for the full amount expended by the corporation for the horses, he stated, "Because two of them had already been disposed of and handled, * * * and the corporation took a loss" on one of them. Between the time of the purchase of the horses in 1948 and 1949 and the entering of the above amount in Gaddy's personal account in 1952, monthly trial *54 balances of the corporation had been prepared in accordance with the way the books existed and had been made available to Gaddy. Despite this no correcting entries were made until 1952. In addition, the corporation claimed a loss on the sale of one of the horses for the year 1949. In this state of the record we must conclude that Gaddy has not met his burden of showing that it was his intention and that of the corporation that the amounts in question should constitute loans, or that, even if there was such an original intention, their intention did not change. Indeed some of the facts, particularly the fact that the corporation claimed a loss on the sale of one of the horses, are directly opposed to the view that there was an intention of repayment by Gaddy. It should be added that we do not have the benefit of the testimony of Gaddy himself. We hold that Gaddy has not shown error in the respondent's determination in respect to the second issue, and that amounts in question constituted ordinary income to Gaddy as dividends. Decisions will be entered under Rule 50. Footnotes
1. It is alleged in the petition and admitted in the answer that a corporation could not obtain a license to sell automobile insurance under the Insurance Law of North Carolina in effect during the years in controversy.↩